## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RANDI NICOLE PRISCO,** | * | **CIVIL ACTION NO.: 22-cv-00715** |
| **on behalf of her minor child, B.P.** | * | |
| | * | **SEC.: "G" (4)** |
| | * | |
| **VERSUS** | * | **CHIEF JUDGE NANNETTE** |
| | * | **JOLIVETTE BROWN** |
| | * | |
| **JOSEPH LOPINTO, III, SHERIFF OF** | * | **MAGISTRATE JUDGE KAREN** |
| **JEFFERSON PARISH, in his official** | * | **ROBY** |
| **capacity, DEPUTY ISAAC HUGHES,** | * | |
| **individually and in his official capacity,** | * | |
| **DEPUTY JOHNATHAN LOUIS,** | * | |
| **individually and in his official capacity,** | * | |
| **DEPUTY ABC, individually and in his** | * | |
| **official capacity, DEPUTY DEF,** | * | |
| **individually and in his official capacity,** | * | |
| **DEPUTY GHI, individually and** | * | |
| **in his official capacity** | * | |

**************************************************************************

## FIRST AMENDED AND SUPPLEMENTAL PETITION FOR DAMAGES

**NOW INTO COURT**, through undersigned counsel, comes Petitioner, **RANDI NICOLE PRISCO**, on behalf of her minor child, B.P., who respectfully submits the following First Amended and Supplemental Petition for Damages as follows:

**To supplement and amend the petition as follows:**

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **RANDI NICOLE PRISCO,** | * | **CIVIL ACTION NO.: 22-cv-00715** |
| **on behalf of her minor child, B.P.** | * | |
| | * | **SEC.: "G" (4)** |
| | * | |
| **VERSUS** | * | **CHIEF JUDGE NANNETTE** |
| | * | **JOLIVETTE BROWN** |
| | * | |
| **JOSEPH LOPINTO, III, SHERIFF OF** | * | **MAGISTRATE JUDGE KAREN** |
| **JEFFERSON PARISH, in his official** | * | **ROBY** |
| **capacity, DEPUTY ISAAC HUGHES,** | * | |
| **individually and in his official capacity,** | * | |
| **DEPUTY JOHNATON LOUIS,** | * | |
| **individually and in his official capacity,** | * | |
| **DEPUTY EDWARD BECK individually** | * | |
| **and in his official capacity, DEPUTY** | * | |
| **FERNANDEZ EFFRON individually** | * | |
| **and in his official capacity**, **and DEPUTY** | * | |
| **DAVID THORNTON individually and in** | * | |
| **his official capacity** | * | |
| | * | |
| | * | |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

1. This is a civil rights action brought pursuant to 42 U.S.C. § 1983 and raising supplemental

state-law claims concerning the actions of Defendants **JOSEPH LOPINTO**, **III,** elected

Sheriff of Jefferson Parish in his official capacity, **DEPUTY ISAAC HUGHES,**

individually and in his official capacity, **DEPUTY JOHNATON LOUIS**, individually

and in his official capacity, **DEPUTY EDWARD BECK,** individually and in his official

capacity, **DEPUTY FERNANDEZ EFFRON,** individually and in his official capacity,

**DEPUTY DAVID THORNTON**, individually and in his official capacity. All claims

being made on the basis of failing to train, failing to screen, failing to have and implement a viable de-escalation policy, failing to have and implement a viable use of force policy, and failing to supervise, all of which caused the use of unreasonable excessive force resulting in the shooting of the decedent, **DANIEL VALLEE ("Mr. Vallee")**, immediately after **Mr. Vallee** honked the horn of a white SUV during an illegal arrest and detention for a misdemeanor noise complaint. An unarmed **Mr. Vallee** was shot by JPSO **DEFENDANT DEPUTIES** over twenty-six (26) times. (*See* Exhibit P-2, video of shooting as seen from nearby home surveillance camera)

2. Defendants were negligent in their acts of participation in the brutal and senseless killing by shooting multiple shots into the body of **Mr. Vallee**, due to **SHERIFF JOSEPH LOPINTO, III** failing to train, screen, supervise, and discipline JPSO **DEFENDANT DEPUTIES. SHERIFF JOSEPH LOPINTO, III** failed to do internal affair investigations of deputies as a custom and practice due to defective policies **SHERIFF JOSEPH LOPINTO, III** has in place.

3. Defendant Deputies **DEPUTY ISAAC HUGHES, DEPUTY JOHNATON LOUIS, DEPUTY EDWARD BECK, DEPUTY FERNANDEZ EFFRON, and DEPUTY DAVID THORNTON (hereinafter referred collectively as "DEFENDANT DEPUTIES")** failure to follow policies and procedures as employees of the Jefferson Parish Sheriff's Office ("JPSO"), which currently is and was at the time of the shooting, under the control of **SHERIFF JOSEPH LOPINTO, III**. Defendant **SHERIFF JOSEPH LOPINTO, III**'s negligence in the failure to have and implement viable policies and training of deputies on de-escalation, the use of force, the making of illegal unconstitutional

stops and illegal detainment of citizens like decedent **Mr. Vallee** without probable cause, and failure to uphold the rights entitled to **Mr. Vallee** under the 4th and 14th Amendments of the United States Constitution, the Louisiana Constitution and Louisiana state laws give rise to this instant lawsuit.

4. This tragedy of shooting unarmed civilians sitting in vehicles causing no harm to anyone will continue to occur due to the dangerous custom and practices, defective training of deputies, defective de-escalation and use of force policies, defective supervision of deputies, defective screening of deputies, and failure to do an internal investigation on the **DEFENDANT DEPUTIES** by JPSO and its Sheriff, **JOSEPH LOPINTO, III.**

## <u>JURISDICTION</u>

5. Petitioner brings this action in this Court pursuant to 28 U.S.C. § 1391(b), as the transactional events constituting the alleged tortious behavior arose and occurred within the City of Marrero, which is situated in Jefferson Parish, State of Louisiana, and in conformity with Fed. Rules Civ. P. Art. 4(d).

6. The cause is further grounded in 28 U.S.C. § 1331 *et seq.* and 1343(a)(3), 1343(a)(4), and 1367(a) as this suit raises questions of federal civil rights law and is also brought pursuant to 42 U.S.C. § 1983 *et seq.* and other related provisions. This action is authorized by 42 U.S.C. §1981, *et seq.*, especially §1983, to redress the deprivation under color of law, statute, ordinance, regulation, custom, and/or usage of rights guaranteed to Petitioners by the First, Fourth, and Fourteenth Amendments to the United States Constitution.

7. Petitioners also seek all relief afforded under state law and including wrongful death and survival actions, specifically pursuant to La. Civil Code Article 2315, 2315.1, 2315.2.

## **PARTIES**

8. Petitioner, **RANDI NICOLE PRISCO (hereinafter referred to as "Petitioner")**, appears individually, but also on behalf of, and as court appointed tutrix of, her minor child B.P., who is also the biological daughter of **DANIEL VALLEE (hereinafter referred to as "Mr. Vallee")**. Petitioner is a person of the full age of majority and domiciled in Jefferson Parish, State of Louisiana. Petitioner was appointed as tutrix of her minor child B.P. in court proceedings of the 24th Judicial District Court, bearing Docket No. 825-928, Div. E, copies of said letters of tutorship are attached hereto as Exhibit P-1 and filed under seal herein.

9. Defendant, **SHERIFF JOSEPH LOPINTO III (hereinafter referred to as "LOPINTO"),** in his official capacity as Sheriff of Jefferson Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana. At all times described herein, **LOPINTO** was the duly elected Sheriff of Jefferson Parish; particularly at the time of the fatal shooting of **Mr. Vallee** which took place on February 16, 2022. He is the head of the Jefferson Parish Sheriff's Office ("JPSO") and as Sheriff is the final policymaker. As Sheriff, **LOPINTO** was responsible for the hiring, staffing, administration, screening, training, supervision, discipline, and control of the JPSO officers; as well as the drafting and implementation of all JPSO policies and procedures regarding all deputies under his command. **LOPINTO** was responsible for all actions of the **DEFENDANT DEPUTIES**. **LOPINTO** was at all times referred to herein, the person

5

that supervised, operated, managed, directed, and controlled the JPSO deputies which he employed. **LOPINTO** is the employer of the JPSO **DEFENDANT DEPUTIES** involved as defendants in this lawsuit and is liable both directly and vicariously for the actions of said deputies complained of herein. **LOPINTO** is sued in his official capacity. **LOPINTO** has not taken any action against the **DEFENDANT DEPUTIES,** nor has not taken any action to discipline or retrain **DEPUTY DEFENDANTS** although **LOPINTO** had notice of the defective handling of the illegal stop of **Mr. Vallee** thru body cams of **DEFENDANT DEPUTIES**. No criminal charges nor any arrest warrants were issued for JPSO **DEPUTIES DEFENDANTS BECK, THORTON and EFFRON**. JPSO and **LOPINTO** have failed to implement any procedure to study and review all body cams of JPSO deputies for improper police procedures and constitutional violations. **LOPINTO** did not investigate or disciplined **DEFENDANT DEPUTIES** for their obvious breaches of JPSO policies, national standards of law enforcement and the shooting of **Mr. Vallee**. JPSO and **LOPINTO** refused to accept an internal affairs complaint on the shooting of **Mr. Vallee** even though one was submitted through a signed complaint of **Mr. Vallee's** daughter. (Exhibit P-3 Complaint from Mr. Vallee's daughter, B.P.). Sheriff **LOPINTO** is the employer of the JPSO deputies involved as defendants in this lawsuit and is liable both directly and vicariously for the actions of said deputies complained of herein. **LOPINTO** is also responsible for the policies, procedures, training, assignments, supervision, discipline and for Internal Affairs Investigation policies and responsible for the conducting of Internal Affairs Investigations of complaints of improper conduct of JPSO deputies.

10. Defendant, **DEPUTY ISAAC HUGHES (hereinafter referred to as "HUGHES"), is** named herein both individually and in his official capacity as one of the deputies who personally participated in the illegal detention of **Mr. Vallee** for an alleged misdemeanor noise violation that resulted in the fatal shooting of **Mr. Vallee.** Immediately after **Mr. Vallee** inadvertently honked the vehicle horn, **HUGHES** began shooting directly at **Mr. Vallee,** emptying his 17 round 40 mm clip of his Glock semiautomatic pistol. Due to the negligence and improper police procedures of all five **DEFENDANT DEPUTIES'** actions encouraged another JPSO defendant-Deputy **JOHNATHAN LEWIS** to begin shooting at **Mr. Vallee** also, which only increased the unreasonable use of excessive force that consequently resulted in the death of **Mr. Vallee.** The shooting of **Mr. Vallee** illustrates the clear failure of **HUGHES** and all the JPSO **DEFENDANT DEPUTIES and LOPINTO** to properly follow basic police procedures and other nationally known standards of law enforcement like the International Association of Police Chiefs (I.A.C.P.) while in the course and scope of their duties, that any reasonable officer and Sheriff under the same or similar circumstances would know.  Deputy **HUGHES** was not disciplined or investigated as a result of the shooting of **Mr. Vallee.**

11. Defendant, **DEPUTY JOHNATON LOUIS (hereinafter referred to as "LOUIS")**, is named herein both individually and in his official capacity as one of the JPSO deputies who personally participated in the illegal detention of **Mr. Vallee** for an alleged misdemeanor noise violation that resulted in the fatal shooting of **Mr. Vallee.** Immediately after **Mr. Vallee** inadvertently honked the vehicle horn, **LOUIS** began shooting directly at **Mr. Vallee**. **LOUIS'S** actions were encouraged by another JPSO defendant Deputy

**HUGHES** who also began shooting at **Mr. Vallee**, which only increased the unreasonable use of excessive force that consequently resulted in the death of **Mr. Vallee.** The shooting of **Mr. Vallee** illustrates the clear failure of **LOUIS** to properly follow basic police procedures and other nationally known standards of law enforcement that any reasonable officer and Sheriff under the same or similar circumstances would know. Deputy **LOUIS** was not disciplined or investigated as a result of the shooting of **Mr. Vallee.**

12. Defendant, **DEPUTY EDWARD BECK (hereinafter referred to as "BECK")**, is named herein both individually and in his official capacity as one of the deputies who personally participated in the  illegal detention without probable cause and never made any objections to the acts of  Deputies **HUGHES** and **LEWIS** at the scene at any time and were a willing participants in the illegal detention of **Mr. Vallee** for an alleged misdemeanor noise violation that resulted twenty-six (26) shots being fired in the fatal shooting of **Mr. Vallee** on February 16, 2022.  No Deputy filed any compliant nor complained about the illegal stop and detention, the total lack of de-escalation techniques used, and the twenty-six (26) shots fired by the Deputies **HUGHES and LEWIS** at any time. At all times material to this complaint, **BECK** personally participated in the unreasonable detention of **Mr. Vallee**, despite the deputies having no reasonable suspicion **Mr. Vallee** had just committed, or was about to commit, a crime. Such actions ultimately led to **DEFENDANT OFFICERS** to begin firing at **Mr. Vallee** over twenty-six (26) times, killing him with eight (8) gunshot wounds to his body. These actions clearly illustrate the undeniable failure of **BECK** to properly follow basic police procedures and other nationally known standards of law enforcement that any reasonable officer under the same or similar circumstances would

know. **BECK** assumed the role of supervising **DEFENDANT DEPUTIES**, for which he was not trained nor qualified. **BECK** never complained of the twenty-six (26) rounds fired by **LOUIS and HUGHES** to anyone that day, as shown on body cams, nor to any supervisor. **BECK** was allowed to act a supervisor although he had no experience and training to be a supervisor. **BECK** was not trained, tested and obviously as per the body cam and defective training materials of the JPSO, was not qualified in de-escalation. **BECK** verbally abused **Mr. Vallee** by using profanity and threatened to shoot and harm **Mr. Vallee** multiple times before **Mr. Vallee** was shot. **BECK** breached JPSO policies, national standards of law enforcement.  Yet, **BECK** was not disciplined or investigated as a result of the shooting of **Mr. Vallee.**

13. Defendant, **DEPUTY FERNANDEZ EFFRON (hereinafter referred to as "EFFRON")**, is named herein both individually and in his official capacity as one of the deputies who personally participated in the illegal detention of **Mr. Vallee** for an alleged misdemeanor noise violation that resulted in the fatal shooting of **Mr. Vallee** on February 16, 2022. At all times material to this complaint, **EFFRON** personally participated in the unreasonable detention of **Mr. Vallee**, despite the deputies having no reasonable suspicion that **Mr. Vallee** had just committed, or was about to commit, a crime. Such actions ultimately led to two other JPSO officers namely **DEPUTIES HUGHES and LOUIS** to begin firing at **Mr. Vallee** over twenty-six (26) times, killing him while endangering **DEPUTIES BECK** and **THORTON** who were in crossfire positions. These actions clearly illustrate the undeniable failure of **EFFRON** to properly follow police procedures and other nationally known standards of law enforcement. Deputy **EFFRON at** one point

lied and told **Mr. Vallee** he was a supervisor and ordered **Mr. Vallee** to get out of the vehicle when he knew the stop of a misdemeanor noise complaint was an unconstitutional police action. Deputy **EFFRON** also failed to take any action de-escalate the illegal stop. Deputy **EFFRON** forgot his body camera and failed to turn it on when Deputy **EFFRON** went back to the police cruiser to get his required body camera in violation of JPSO policy. Deputy **EFFRON** did not take any action to stop the illegal stop and detention of **Mr. Vallee.** Deputy **EFFRON** was also not properly trained and tested in de-escalation nor was he a trained in supervision of other deputies. Deputy **EFFRON** was not disciplined or investigated as a result of the shooting of **Mr. Vallee.**

14. Defendant, **DEPUTY DAVID THORNTON ("THORNTON")**, is named herein both individually and in his official capacity as one of the deputies who personally participated in the illegal detention of **Mr. Vallee** for an alleged misdemeanor noise violation that resulted in the fatal shooting of **Mr. Vallee** on February 16, 2022. At all times material to this complaint, **THORNTON** personally participated in the unreasonable illegal stop and detention of **Mr. Vallee** without probable cause, despite the deputies having no reasonable suspicion that **Mr. Vallee** had just committed, or was about to commit, a crime. **Mr. Vallee** was stopped and killed over a noise complaint, a misdemeanor and shot at twenty-six (26) times which was excessive force. Such actions ultimately led to two other JPSO officers, Deputies **HUGHES and LOUIS**, to begin firing at **Mr. Vallee** over twenty-six (26) times, killing **Mr. Vallee** with eight (8) bullet wounds in his body. Deputy **THORNTON** also told **Mr. Vallee** he would shoot him before he was shot which was improper as the vehicle never moved and was in park during this whole event. These actions clearly illustrate the

undeniable failure of **THORNTON** to properly follow police procedures and other nationally known standards of law enforcement. Deputy **THORTON** failed to de-escalate because he was not properly trained and tested in de-escalation by JPSO and **LOPINTO.** Deputy **THORNTON** was not disciplined or investigated as a result of the shooting of **Mr. Vallee.**

15. **DEFENDANT DEPUTIES** were negligent and created a dangerous situation placing themselves in dangerous positions that were their own doing that led to the escalation and show or force to **Mr. VALLEE** that resulted in **Mr. VALLEE's** death. For example**, DEPUTY HUGHES** negligently placed himself in in front of **Mr. Vallee's** car with his semiautomatic pistol with lights mounted drawn. At points **HUGHES** moves and searches the inside of the **Mr. Vallee** vehicle with his flashlight and finds no weapons visible.  Then he moves back in front of the **Mr. Vallee's** car assuming a dangerous position. **DEPUTY BECK AND THORTON** were in lines of crossfire and after orders from **HUGHES** to move out of the way, **HUGHES** immediately began firing followed instantly by **LOUIS** firing into the vehicle of **Mr. Vallee** (Exhibit P-4) None of the **DEFENDANT DEPUTIES** had any information that any criminal offense was being committed or had been committed except for a noise complaint filed by a neighbor. The noise had stopped when **Mr. Vallee** was approached, and the neighbor refused to come out of her house. Nevertheless, **DEFENANT DEPUTIES** pushed forward to pressured **Mr. Vallee** in needless escalation of a misdemeanor at best offence to use deadly force due to their joint escalation of force.

16. None of the weapons of the **DEFENDANT DEPUTIES** were seized the night of the shooting and **DEFENDANT DEPUTIES** contaminated the crime scene by walking over shell casings and not sealing off the area.

17. At all times material to this complaint, **DEFENDANT LOPINTO, and DEPUTIES, LOUIS, HUGHES, BECK, THORTON and EFFRON** named above acted in concert, conspiracy, and retaliation with each other.

18. **DEFENDANT DEPUTIES and LOPINTO** are liable jointly and *in solido* for the harms caused to **Mr. Vallee** after **DEFENDANT DEPUTIES** unlawfully detained **Mr. Vallee** without any reasonable suspicion, which consequently led to the reckless and fatal shooting of **Mr. Vallee**. The five **DEFENDANT DEPUTIES** all acted together and conspired to do a knowingly unlawful detention of **Mr. Vallee** and escalated the illegal detention resulting in the death of **Mr. Vallee.**

19. At all times material to this complaint, all named **DEFENDANTS** named above acted under color of state law.

## **FACTUAL ALLEGATIONS**

20. At all times material to this complaint, all **DEFENDANT DEPUTIES** named above were deputies employed by the JPSO. **DEPUTY ISAAC HUGHES, DEPUTY JOHNATON LOUIS**, **DEPUTY EDWARD BECK, DEPUTY FERNANDEZ EFFRON, and DEPUTY DAVID THORNTON (hereinafter referred collectively as "DEFENDANT DEPUTIES")** were on duty the night of February 16, 2022, acting in the course and scope of their duties as law enforcement deputies and had been employed by JPSO and **LOPINTO** prior to and on this night.

21. On the night of February 16, 2022, at or around 2:15 a.m., the JPSO received a call regarding a noise complaint coming from a house on the 500 block of Wilson St. in Marrero, Louisiana. **DEFENDANT DEPUTIES** responded to the call.

22. **Mr. Vallee** was merely sleeping in his white SUV, when these five **DEFENDANT DEPUTIES** confronted **Mr. Vallee**. **Mr. Vallee** had not committed, or was about to commit, any criminal act; was not engaging in any act that would create reasonable suspicion, but was nevertheless awakened by five, fully armed (Glock semi-automatic pistols flashlights attached) and uniformed JPSO **DEFENDANT DEPUTIES** shining flashlights into his car and aggressively questioning him.[1] The **DEFENDANT DEPUTIES** encircled **Mr. Vallee** while in the SUV from all directions, effectively preventing him from escaping.[2] **Mr. Vallee** then lowered his driver's side window, and the **DEFENDANT DEPUTIES** proceeded to detain him for a duration exceeding thirteen (13) minutes with 40 mm semiautomatic pistols with lights drawn and pointed at **Mr. Vallee**.[3] The **DEPUTY DEFENDANTS** all gave contradictory directions to Mr. Vallee, demanding he turn his ignition off, but to also keep his hands up.[4] **Mr. Vallee** was in fear of his life and told **DEFENDANT DEPUTIES** he did not have a weapon. **Mr. Vallee** did

---

[1] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[2] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[3] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[4] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.

not have any weapons, and **Mr. Vallee** said three times that the **DEFENDANT DEPUTIES** were out to shoot him before he was killed later that night.[5]

23. Because **Mr. Vallee** believed he did not commit any crime, he did not get out of his vehicle, as the **DEFENDANT DEPUTIES** unreasonably demanded. Upon arriving on the scene, **DEFENDANT DEPUTIES** had several viable options requiring lesser force to obtain **Mr. Vallee's** compliance. These other viable de-escalation techniques include, but are not limited to, Tasers, Batons, Pepper Spray and/or other means that would not have resulted in firing their weapons. Instead, all **DEFENDANTS** chose to continue to illegal detain **Mr. VALLEE** and escalate the situation.

24. The **DEFENDANT DEPUTIES** failed to block **Mr. Vallee's** vehicle with other police cars in order to prevent his potential escape from detainment. Instead, **DEFENDANT DEPUTIES** chose to endanger **Mr. Vallee** and themselves by positioning themselves in the front and the sides of **Mr. Vallee's** vehicle.[6] **DEFENANT OFFICERS** also placed themselves, with guns drawn, in the danger of crossfire positions, which needlessly endangered other deputies.[7]

25. Rather than engage in de-escalating tactics to decrease tension with the encounter, all five uniformed **DEFENDANT DEPUTIES** drew their firearms with blinding flashlights mounted to each semiautomatic pistol and pointed them at **Mr. Vallee**.[8] Such an

---

[5] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[6] Exhibit P-4 Diagram of JPSO Vehicle positions.
[7] Exhibit P-4 Diagram of JPSO Vehicle positions.
[8] (*See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.

unnecessarily aggressive response from law enforcement caused **Mr. Vallee** to be in fear for his safety. **Mr. Vallee** reacted by putting his hands in the air, pleading with the officers to just put their weapons down and turn off their blinding flashlights.  Deputies **EFFRON, HUGHES, THORTON and BECK** are seen on the body cams examining the inside of the **Mr. Vallee's** vehicle and all **DEFENDANT DEPUTIES** knew there were no guns or weapons in the vehicle.[9]

26. At some point, amongst the yelling, flashlights, and chaos, **Mr. Vallee** inadvertently honked the vehicle horn while trying to turn off the engine of the vehicle as commanded to do by the **DEFENDANT DEPUTIES**.[10] Instantly, **HUGHES** and **LOUIS** began firing directly in the direction of **Mr. Vallee** firing an excessive number of twenty-six (26) rounds into the vehicle and **Mr. Vallee's** body.[11] Eight (8) bullets entered **Mr. Vallee's** body killing **Mr. Vallee.[12]** Deputies **HUGHES and LOUIS** reloaded their weapons after the shooting.

27. All five **DEPUTY DEFENDANTS** knew, or should have known, that **Mr. Vallee** was unarmed and at no point engaged in threatening or suspicious behavior. **DEFENDANT DEPUTIES** had a clear view into **Mr. Vallee's** vehicle, could see into his vehicle and inspected it with their flashlights. **DEFENDANT DEPUTIES** witnessed **Mr. Vallee** plead with them to lower their weapons, further requesting they turn the flashlights off and stop

---

[9] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[10] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[11] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.
[12] Exhibit P-9 Coroner's Report.

shining the flashlights in his eyes.[13] Nevertheless, as soon as **Mr. Vallee** inadvertently honked his horn in response to the **DEFENDANT DEPUTIES** actions, excessive force was still used by twenty-six (26) multiple shots of deadly force being fired directly at **Mr. Vallee.**

28. At no point during this entire encounter did any of the **DEFENDANT DEPUTIES** make any attempt to intervene in the contentious encounter. Instead, **DEFENDANT DEPUTIES** used of profanity, intimidation, and illegally stopped and detained **Mr. Vallee.** Rather than taking charge of the encounter by employing de-escalation tactics, the **DEFENDANT DEPUTIES** cursed at **Mr. Vallee**, threatened to shoot **Mr. Vallee**, and did nothing but make the encounter more hostile than it initially was when they first approached **Mr. Vallee**.

29. The front windshield and rear windows were shot out with twenty-six (26) rounds fired by **HUGHES** and **LOUIS'** gunfire, illustrating the recklessness and unreasonable excessiveness of force used. Even though fellow deputies were surrounding the car, **HUGHES** and **LOUIS** gunfire endangered themselves and the other deputies by firing multiple gunshots without regard to the risk that **DEFENDANT DEPUTIES** in the line of fire and crossfire could be struck. Deputies **HUGHES** shouted to **BECK and EFFRON** to get out of the way of crossfire and then immediately opened fire with **LOUIS.**

30. Petitioner alleges that **Mr. Vallee** was brutally and without provocation, justification, or probable cause, shot to death by twenty-six (26) multiple gunshot wounds fired by

---

[13] *See* Exhibits Filed Under Seal P-5 Body Cam of Deputy Beck, P-6 Body Cam of Deputy Hughes, P-7 Body Cam of Deputy Louis, and P-8 Body Cam of Deputy Thornton.

Defendants **HUGHES** and **LOUIS** at approximately 2:15 a.m. on February 16, 2022 and **Mr. Vallee** was declared dead at 2:42 a.m. after being shot.[14] **Mr. Vallee** was still alive for about 20 minutes while CPR was given.

31. Petitioner further alleges that all other named **DEFENDANT DEPUTIES** failed to intervene, and instead conspired amongst themselves and with other agents and employees of the Jefferson Parish Sheriff's Office to conceal the facts of the killing and to intentionally deceive Petitioners, the Prisco family, and the public in an attempt to avoid responsibility, liability, and accountability for these egregious and illegal actions.

32. **DEFENDANT DEPUTIES** were not subject to any internal investigation and not disciplined despite multiple negligent acts and violation of national police standards.

33. Despite written requests pursuant to the Louisiana Public Records Act, **LOPINTO** has refused to do any internal investigations related to the shooting death of **Mr. Vallee.** Only a criminal investigation was done to investigate only Deputies **LOUIS AND HUGHES,** with only manslaughter charges brought against Deputies **LOUIS AND HUGHES.** No internal investigation was done by the JPSO Sheriff **LOPINTO's** staff of the improper police procedures used by all the **DEFENDANT DEPUTIES.** No action was taken to retrain or discipline **DEFENDANT DEPUTIES**.

34. Upon information and belief, JPSO and **LOPINTO**, to date, has not amended or made any changes to its policies and procedures regarding the need for de-escalation training, and

---

[14] Exhibit P-9 Coroner's Report.

training on the use of excessive force by JPSO deputies nor done any internal investigation of the shooting to date.

35. Petitioner reserves its right to supplement and amend its pleadings after the additional public records are produced, as well as after additional discovery is completed in this matter.

## CAUSES OF ACTION

**Count I: Federal Constitutional** *and Civil Rights Claims against the JPSO and Deputy Defendants under 42 USC 1983 and the U.S. Constitution, in their Individual and Official Capacities*

36. Petitioners incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

37. The actions described of all defendants herein named violated **Mr. Vallee's** rights under the Fourth and Fourteenth Amendments to the United States Constitution to be free from unlawful detention and use of excessive force.

38. The actions of the above named JPSO **DEFENDANT DEPUTIES**, in using excessive and unreasonable force in the seizure and detention and shooting twenty-six (26) rounds with eight (8) rounds entering the body  of **Mr. Vallee** killing him  and in failing to intervene or act to prevent such actions, despite having the opportunity and duty to do so, as set forth herein, violated the rights of **Mr. Vallee**, as guaranteed under the Fourth and Fourteenth Amendments to the U.S. Constitution, to liberty, due process, equal protection, to be free from unreasonable seizure and detention and to be free from the unjustifiable and excessive use of force, all in violation of 42 USC 1983.

39. The JPSO **DEFENDANTSDEPUTIES**, acting together in concert and under the color of law, reached an understanding, engaged in a course of conduct, and otherwise conspired

among themselves to commit those acts described herein and to deprive **Mr. Vallee**, of his constitutional and civil rights as set forth herein, in violation of 42 USC 1983.

40. The JPSO **DEFENDANT DEPUTIES and LOPINTO** had knowledge of the wrongs done and conspired to be done as described herein, had the power to prevent or aid in the prevention of same, yet failed or refused to do so, in violation of 42 USC 1983.

41. During the events described herein, **LOPINTO** and **DEFENDANT DEPUTIES** were aware of the unlawful detention and use of excessive force as shown on body cams of the deputies but did not intervene to prevent the violation of **Mr. Vallee's** constitutional rights, even though they had the opportunity and duty to do so.

42. At all times relevant herein, JPSO **DEFENDANT DEPUTIES** committed the acts described herein under the color of state law and by virtue of their authority as deputies of the JPSO and in the course and scope of their employment, and substantially deprived **Mr. Vallee** of his clearly established rights, privileges and immunities guaranteed to him as a citizen of the United States pursuant to the Fourth and Fourteenth Amendments in violation of 42 U.S.C § 1983, including, but not limited to:

   a. The right to freedom from unreasonable seizure;

   b. The right to freedom from the use of unreasonable, unjustified, and excessive force and summary punishment;

   c. The right to freedom from deprivation of liberty without due process of law;

   d. The right to receive timely and appropriate medical monitoring and attention;

   e. The right to freedom from arbitrary governmental activity which "shocks the conscience" of a civilized society in violation of his substantive due process rights;

   f. The right to privacy;

    g.   The right to liberty;

    h.   The right to be free from deadly force;

    i.   The right to freely move about; and

    j.   The right to freedom from deprivation of liberty without due process.

43. The actions of the JPSO **DEFENDANT DEPUTIES** described herein were the direct and proximate cause of the injuries, including his death, to **Mr. Vallee**.

44. The actions of the JPSO **DEFENDANT DEPUTIES** described herein were done with deliberate indifference and were intentional, malicious, reckless, cruel, and performed with malice.

45. Even after **Mr. Vallee** was detained, the JPSO **DEFENDANT DEPUTIES** took no steps to deescalate the situation or modulate their use of force.

46. The JPSO **DEFENDANT DEPUTIES** did not use force that was commensurate with **Mr. Vallee's** level of contemporaneous resistance.

47. The JPSO **DEFENDANT DEPUTIES** violated JPSO policies and procedures on the date of this incident such as SOP-30 Arrest Policy for the Jefferson Parish Sheriff's Office.

**Count II: Federal *Constitutional and Civil Rights Claims Against Sheriff Joseph P. Lopinto III in his Individual Capacity***

48. Petitioner incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

49. The actions and/or inactions of all defendants herein named directly and proximately caused violations of **Mr. Vallee's** rights under the Fourth and Fourteenth Amendments to the United States Constitution, resulting in damages to **Mr. Vallee**. In addition, the actions and/or inactions of all **DEFENDANTS** herein named directly and proximately caused **Mr. Vallee's** death.

50. The conduct of the individual **DEFENDANT DEPUTIES** is a direct and proximate result of the actions and/or inactions of the JPSO and reflect the need for increased or additional training, supervision, investigation, and discipline. As Sheriff of JPSO, **LOPINTO** has had a custom and practice due to the defective policy of not opening up internal affairs investigations following incidents of shootings of civilians and excessive force by JPSO deputies. **LOPINTO** tolerated, ratified, and been deliberately indifferent to the following policies, patterns, practices, and/or customs of the JPSO:

    a.  The use of excessive force by police officers;

    b.  The implementation, training and testing of deputies of de-escalation tactics when encountered with tense situations;

    c.  Law enforcement's use of their status as police officers to employ the excessive use of force;

    d.  The proper exercise of police powers, including, but not limited to making an arrest, engaging with civilians, and what constitutes reasonable use of force;

    e.  The monitoring of officer conduct and proper disciplinary procedures when officers are found to have engaged in misconduct;

    f.  The failure to identify and take remedial or disciplinary action against any police officers who is, or was, the subject of prior complaints of misconduct raised internally or by actual private citizens;

    g.  The failure of police officers to follow established policies, procedures, directives, and instructions regarding arrests, engagement with civilians, de-escalation, and the use of force under such circumstances as presented by this case, and further laid out above;

h. The failure to screen deputies such as Deputy **HUGHES** who had failed multiple screening tests and was hired anyway by JPSO before being hired and transferred from the Gretna Jail and not monitored, tested, and supervised;

i. Failure to update JPSO initial and recurrent training on use of force and de-escalation;

j. Failure of **LOPINTO** and JPSO to review all body cams of deputies in order to prevent excessive force and police shooting;

k. Failure of **LOPINTO** and JPSO to review all body cams of deputies in order to prevent excessive force and police shootings; and

l. The custom and practice of **LOPINTO** who know of I.A.C.P. standards to require the internal investigation of critical events, but who refuses to do so. The JPSO and **LOPINTO** refused to do internal investigation ins deaths in custody cases in the past and continues to do so.

51. Defendant, **LOPINTO**, as Sheriff, has failed to supervise, monitor, screen, or adequately train his deputies. **LOPINTO**, as Sheriff, has enabled a custom and practice of approaching citizens who are unarmed and not a threat, then shoot into the citizens vehicle without even attempting to use more reasonable, lesser levels of force. These lesser levels of force may include, but are not limited to, use of Tasers (ECDs) and Pepper Spray, or use of any other instrument(s) of intermediate force. Until recently, the JPSO did not use, or support implementation of, body worn cameras in shootings such as the one that killed **Mr. Vallee**.

52. **LOPINTO**, as sheriff, has enabled a custom and policy that any such incidents and/or complaints to the Internal Affairs Department of JPSO are dismissed without any indication that remedial actions to retrain, revise policies, or discipline officers involved in

police shootings, are ever taken. This is due, in large part, to the absence of video footage

of these shootings, which principally are used nationwide to hold law enforcement officers,

like JPSO Deputies, accountable for their actions. JPSO does not review most of the  body

cams of deputies unless there is a death or excess force complaint.  So improper police

practices continue.

53. JPSO failed to adopt the use of body cams by their deputies for years prior to this incident

in the past. JPSO's fails to review body cams of their deputies after similar incidents, to

prevent improper police procedures and excessive force being used.

54. **LOPINTO** did not conduct any internal affair investigation into the shooting of **Mr.**

**Vallee,** nor was any internal affairs investigation ever conducted to determine the root

cause of the failure of the **DEFENDANT DEPUTIES** to follow known standards of law

enforcement. Only a criminal investigation was done to determine criminal acts committed

by Deputies **LOUIS and HUGHES**. No investigation was ever done to determine if the

other **DEFENDANT DEPUTIES** acted properly and followed JPSO policies and were

trained properly or retrained, suspended nor disciplined. The only action taken was the

arrest and termination of Deputies **JOHNATHON LEWIS and ISAAC HUGHES.**

55. While JPSO has policies and procedures such as SOP-22 Internal/Administrative

Investigations and Suspension Policy for the Jefferson Parish Sheriff's Office and SOP-30

Arrest Policy for the Jefferson Parish Sheriff's Office, **LOPINTO** refuses to enforce them.

They are paper policies that are not implemented and therefore not implemented and are

worthless if not enforces. **LOPINTO** also has a defective policy on internal affairs

investigations and requires a written complaint from the victim of do an internal affairs

investigation. **LOPINTO** refuses to follow national standards of law enforcement like

International Association of Police Chiefs (IACP) policy to open internal investigations when the department receives information of wrongdoing from any and all sources. As a result, no internal investigation was done on **DEFENDANT DEPUTIES** and this excess force shooting will happen again.

56. JPSO deputies, while under the command of **LOPINTO**, will continue to violate constitutional rights of private citizens until such time JPSO policymakers, including **LOPINTO**, fully implement, adopt, or revise any written and/or communicated policies that address:

    a. Ensuring all deputies are adequately trained on all areas of law enforcement discussed herein;

    b. Engaging with civilians unless there is probable cause to suspect the person is, or was, committing criminal activity;

    c. The need for more thorough and concurrent training in all areas of law enforcement;

    d. Fully implementing and communicating any and all policies or procedures that are or was involved in the areas of law enforcement;

    e. Effectively retrain and subsequently monitor all deputies on the use of force and retrain any who are found to have used unreasonable use of force;

    f. The need to fully and thoroughly investigate any deputy involved shootings;

    g. Making sure deputies undergo adequate initial training and re-training timely;

    h. Making sure Deputies are tested on each subject or topic like de-escalation and other mandatory police training after training;

    i. Failing to keep accurate records of training;

j.   Failure to use re-training as a method of discipline and to prevent future excess force incidents;

k.   **LOPINTO** failed to promulgate a Use of Force policies that required its/their Deputies to use de-escalation techniques, which fell below national de-escalation recommendations, guidelines, and training;

l.   **LOPINTO** failed to train its and/or their deputies in de-escalation tactics and techniques with the limited exception of suicidal patients so as not to escalate a situation between deputies, suspects, and/or citizens;

m.   **LOPINTO** failed to follow national Career and Technical Education standards and guidelines for the competency-based testing of deputies in high-risk subject and/or policy areas to determine their competency;

n.   **LOPINTO** failed to conduct an administrative/internal investigation into the fatal shooting of **Mr. Vallee**, which falls below administrative/internal investigation national standards, recommendations, and guidelines;

o.   **LOPINTO** created an organizational culture whereby Deputies were not disciplined for disturbing a crime scene, for violating officer-involved shooting protocols, and/or for the practice of not requiring a supervisor be present during a confrontation with a suspect such as **Mr. Vallee**; and

p.   Given Deputy **HUGHES** repeated testing failures and other "flag" negative indicators, **LOPINTO** should not have subjectively hired him as a road deputy given the compelling objective findings that he was not qualified to become a road deputy, which was a material cause in the fatal shooting of **Mr. Vallee.**

**Count III: State Law Claims**

57. Petitioner incorporate and reassert the allegations in each preceding and following paragraphs of this Complaint.

58. The actions of all defendant-deputies named herein constitute the intentional torts of assault and battery under the laws of the State of Louisiana. Specifically, the Petitioner Randi Prisco on behalf of her minor child B.P. of her father **Mr. Vallee claims** damages pursuant to La. C.C. art. 2315, La. C.C. art. 2351.1 (the survival action), and La. C.C. art. 2315.2 (wrongful death action).

59. Petitioner avers that all defendant-deputies named herein are liable for damages caused by the negligence, fault, and/or intentional acts of any or all **DEFENDANT DEPUTIES.** Petitioner further avers that she and her minor child are entitled to survival damages based upon the violations of **Mr. Vallee's** civil rights, prior to his death, caused **Mr. Vallee** physical pain and suffering, severe emotional distress and complete terror before his death and survival damages. In addition, Petitioner avers that she and her minor child are entitled to wrongful death damages, based upon the loss of consortium and economic loss including, but not limited to, loss of love and affection, guidance, past and future and parental support.

**JURY TRIAL REQUESTED**

60. Petitioner requests a jury in this case as to all portions of the case to which a jury trial is available.

**PRAYER FOR RELIEF**

61. Petitioners list their damages and prays for relief as follows:

    1. Damages for wrongful death pursuant to La. C.C. art. 2315.2 for the daughter of **Mr. Vallee**, B.P.;

2. Survival damages pursuant to La. C.C. art. 2315.1 for **Mr. Vallee** which he suffered prior to his death, to be awarded to B.P.;

3. Past pain and suffering of decedent, **Mr. Vallee**;

4. Past mental anguish of decedent, **Mr. Vallee**;

5. Past mental anguish of the daughter of **Mr. Vallee**, B.P.;

6. Future mental anguish of the daughter of **Mr. Vallee**, B.P.;

7. Loss of guidance and emotional support to B.P. due to the death of her father, **Mr. Vallee**;

8. Loss of love and affection of B.P. due to the death of her father, **Mr. Vallee**;

9. Loss of financial support for B.P. due to the death of **Mr. Vallee**; and

10. Punitive damages against all named police officers for their unlawful and unconstitutional actions which resulted in the killing of **Mr. Vallee**.


Respectfully Submitted:

**The Law Office of Glenn C. McGovern Corp.**

*/s/ Glenn C. McGovern*
Glenn C. McGovern   (LBA #9321)
Andrew Maberry      (LBA #38825)
Callan J. Johns       (LBA #38788)
*Attorneys for Petitioner*
**Mailing Address:**          **Physical Address:**
P.O. Box 516          2901 Division Street, Suite 201
Metairie, La 70004        Metairie, LA 70002
**Phone:**  (504) 456-3610
**Fax:**      (504) 456-3611
**Email:**  glenn@glennmcgovern.com

**<u>PLEASE SERVE:</u>**

1. **Sheriff Joseph Lopinto, III**
   *Thru the Jefferson Parish Sheriff's Office*
   3300 Metairie Road
   Metairie, Louisiana 70001

2. **Deputy Isaac Hughes**
   301 Virginia Avenue
   McComb, Mississippi 39648

3. **Deputy Johnaton Louis**
   3623 Forest Park Lane
   New Orleans, Louisiana 70131

4. **Deputy Edward Beck**
   *Thru the Jefferson Parish Sheriff's Office*
   3300 Metairie Road
   Metairie, Louisiana 70001

5. **Deputy Fernandez Effron**
   *Thru the Jefferson Parish Sheriff's Office*
   3300 Metairie Road
   Metairie, Louisiana 70001

6. **Deputy David Thornton**
   *Thru the Jefferson Parish Sheriff's Office*
   3300 Metairie Road
   Metairie, Louisiana 70001